# CHARLESTON.

CURTIS *et al.* v. PINEY COLLIERY Co., *et als.*

Submitted March 22, 1910.   Decided February 28, 1911.

MINES AND MINERALS—*Conveyances—Exceptions.*

A deed to defendants' predecessors in title conveyed to the grantees, with general warranty, "all the coal and other minerals in, upon and under" a certain tract of land; but contained the following exception, under which plaintiffs claim: "And said grantors reserve the top vein of coal in hill tops above my dwelling house." Considered in the light of all the facts and circumstances known to and surrounding the grantors at the time, this exception should be construed as applying to a vein of coal then existing, and of which the grantors are shown to have had some knowledge, and believed by them to exist in the hill tops back of said dwelling, and not to the vein or seam of coal in controversy then and prior thereto, sometimes referred to as the "top vein," and by other names, found some sixty or

seventy feet under ground at said dwelling house, and not in the hill tops back of said dwelling.

(BRANNON, JUDGE, absent.)

Error to Circuit Court, Raleigh County.

Action by Milton Curtis and others against the Piney Colliery Company and others. Judgment for defendants, and plaintiffs bring error.

*Affirmed.*

*File & File,* for plaintiffs in error.

*McGinnis & Hatcher* and *Brown, Jackson & Knight,* for defendants in error.

MILLER, JUDGE:

In ejectment, after plaintiffs had introduced all their evidence, oral and documentary, defendant offering no evidence, the court below on its motion struck out all the evidence and directed a verdict for defendant, and to the judgment of the circuit court thereon, that plaintiffs take nothing by their action, they obtained a writ of error from this Court.

The property sued for, as the declaration in three counts alleges, is the "Sewell seam or vein of coal, * * * now also known as and called the No. 5 seam or vein of coal, and which * * * was on the 10th day of December, 1888, and for many years prior" thereto "known as and called the top vein or seam of coal," and which is in and underlying the tract of land in Raleigh county, described in the declaration, by metes and bounds, as containing 108 1-2 acres, and of which it is alleged plaintiffs were possessed of an estate in fee simple absolute.

Plaintiffs and defendant have a common source of title, and their respective rights to the coal in controversy depend on the construction to be given to the deed from Amos Williams and Susan A., his wife, to H. A. Gray, and others, trustees, dated December 10th, 1888, whereby, for the consideration therein expressed, the grantors granted unto the grantees with general warranty, "all the coal and other minerals in, upon and under" said tract or parcel of land further described as "containing by recent survey 108 1-2 acres, and known on the plat of the lands of the C. C. C. L. Association as No. 6, and bounded," as de-

scribed in the declaration. After this grant the deed contains this exception or reservation: "And said grantors reserve the top vein of coal in hill tops above my dwelling house." By a subsequent clause in the deed the usual mining rights are also granted to said second parties.

Plaintiffs claim the coal excepted or reserved in said deed, by a subsequent deed from said Susan A. Williams, widow, and Elsie W. Williams, sole heir of said Amos Williams, deceased, dated March 10th, 1904, granting unto each of them, with general warranty, a' one-half undivided interest, being all the right, title and interest, both legal and equitable, to the said tract of land, described as in said declaration, excepting therefrom, however, "a part of the coal and other minerals as heretofore conveyed to H. A. Gray," of record in said Raleigh county, in Deed Book "J", page 341. Defendants by *mesne* conveyances have derived title to the coal and mining rights granted to said Gray and others, trustees.

Counsel for plaintiffs have in their brief argued elaborately, with copious citations of authorities, the question of plaintiffs' remedy by ejectment; also the question whether the clause in the deed of December 10th, 1888, reserving "the top vein of coal in hill tops above my dwelling house," should be construed as an exception or a reservation. Defendants' counsel concede the remedy, and admit that the so called reservation should be construed as an exception. So we need not trouble ourselves for the purposes of this case with these questions. Indeed, we think, there can be no doubt as to the remedy by ejectment; nor as to the proposition that the reservation in the deed, properly construed, is an exception.

So we have but the one question, what was excepted from the grant? Was it, as plaintiffs claim, the Sewell, or No. 5 seam, described in the declaration, or, as defendants contend, some other vein actually existing or believed by the grantors at the time to exist "in the hill tops above my dwelling house"?

Plaintiffs' contention and theory is that on and prior to the date of the deed, in the vicinity of this land, there was but the one seam or vein of coal known and recognized as the top vein or seam, namely. the one now in controversy, from four to five feet in thickness, and that this seam or vein of necessity must have been the one referred to, and excepted in the grant of

1888. The evidence, however, shows that this seam had then been opened on the William Warden land adjoining the Williams tract on the South, and within about three hundred yards of his South West line, at an elevation of about 123.19 feet, an outcrop thereof also appearing in a little branch or stream of water traversing both tracts from North East to South West, about a hundred yards north of the first opening, at an elevation of about 117.19 feet, and also at one or two other places within a mile or so of the Williams tract as early as the year 1889, and which seam was also referred to by various names, "McNamee Seam"; "Top Seam"; "Upper Seam"; "Warden Seam"; "Bill Warden Coal Bank," &c. These coal banks had never up to the date of the deed been worked, except in a small way for local and domestic use. The evidence further shows that this seam of coal does not exist in the hill tops back of the dwelling house. The hill tops are there, but the seam of coal is not found present. It was found, however, before the deed, at the bore hole south of the house, and a little north of Warden's line at about the depth of thirteen feet, and later at the house, situated two to three thousand feet north of the opening on the William Warden land, at an elevation of 149.34 feet, and at a depth below the house from sixty to seventy feet, and at an increased depth as you go north and notheast on adjoining lands.

But notwithstanding the existence of these physical facts respecting the location of the Sewell or No. 5 seam, it is insisted that that seam, must, in the light of the surrounding facts and circumstances, by proper construction, be regarded as the subject matter of the exception in the deed, even though to do so requires us to wholly disregard the words of description therein, "in the hill tops above my dwelling house." Many decisions are cited and relied on, and rules of construction invoked in able and exhaustive briefs of learned counsel pro and con this proposition. Included among the cases cited is our own case of *Armstrong* v. *Ross,* 61 W. Va. 38, which plaintiffs' counsel regard as decisive of the case at bar. But the view we take of the documentary and oral evidence does not require us to here examine the many decisions cited, or to apply all the various rules of construction relied on.

The general rule to be observed in construction of deeds as of all other contracts, and which we think is the only rule we need

observe in disposing of this case, is that in construing a deed the object is to ascertain the intention of the makers, as gathered from the language used, and the general purpose and scope of the instrument in the light of the surrounding circumstances, and when such intention clearly appears by giving the words their natural and ordinary meaning technical rules of construction will not be invoked to defeat it. Citation of authority for this proposition seems wholly unnecessary, but we cite *Uhl* v. *Railroad Co.,* 51 W. Va. 107, point 6; *McDougal* v. *Musgrave,* 46 W. Va. 509, point 2; 17 Am. & Eng. Ency. Law, (2nd Ed.) 7; Devlin on Deeds, (2nd Ed.) sections 837, 850; *Preston* v. *White,* 57 W. Va. 280, 283.

If we could view the evidence as counsel for plaintiffs view it, there would be great force in their argument, that in construing the deed here and applying the exception to the subject matter we should reject the description "in the hill tops above my dwelling." They assume that the Sewell seam, as then exposed on the William Warden land, in the light of the surrounding facts and circumstances, was necessarily the subject of that exception, and the only seam or vein to which the parties could have had reference in the execution of the deed. But we cannot so view the evidence. We cannot view the words of description, which we are asked to reject, otherwise than as having great force. While it is true the Sewell seam was sometimes referred to as the top seam, it does not follow that that was the seam intended to be excepted. It is practically conceded that the grantor must have thought that the top seam intended to be excepted, and described as located "in the hill tops back of my dwelling" actually existed there, else they would not in the deed have located it there. But it is said that in this supposition they were evidently mistaken, and as they call for the "top vein" in their exception the parties must have had in mind the Sewell seam, or the vein of coal exposed on the Warden and other lands in that vicinity, a seam now shown to be from sixty to seventy feet below the surface at the dwelling house, and at a still greater depth under the hill tops back of the house. The evidence, however, also discloses the fact that there is and then was a vein of coal answering more or less accurately the description in the deed, located in the hill tops above the dwelling house, at or below a small sulphur spring, at an elevation of about five feet above the

bottom sill of the house and at a distance of from three to four hundred feet therefrom, and about five and a half inches thick, and which has been found cropping out at one or two other points. It is argued by counsel, however, that the evidence shows that this small insignificant vein had not then been discovered, and was unknown to the grantors, prior to or at the date of the deed, and that it cannot be assumed the parties were contracting with reference to a vein or seam of coal unknown to them. For this proposition *Armstrong* v. *Ross, supra,* is cited and relied upon. That decision would be in point if the facts were as assumed. Aside from the fact that the description in the deed points to a vein of coal in the hill tops above the dwelling, the evidence satisfies us that the grantors, at the date of their deed, did have actual knowledge or belief in the existence of a seam of coal in the vicinity of the sulphur spring. The evidence shows that he and others had prospected for coal in that vicinity. Witness Jeff Warden says, that prior to the death of Williams, he had been at this sulphur spring a number of times; he could not say how often. The last time he remembers to have been there was a month or two prior to the death of Williams. There was then "a space as big as this court room of brush, and amidst the brush was a spring just flowing out of the hill, and they called it the sulphur spring." When asked about the condition of the ground, with reference to having been prospected for coal, he says, there was "just a little coal in the mouth, in the flow of the spring, that was all." Frank Greer, another witness, referring to a time before the death of Williams, and to the prospecting that had been done for coal at or near this spring, says, that there had been some prospecting done there just opposite the spring on the left hand side, but he does not know that any coal was found there, but says, there might have been. John Williams, a brother of the grantor, testifies that prior to his brother's death he and his brother had prospected for coal in the vicinity of this spring, but he professes not to have found any coal there. Josiah Teel and Levi Williams, two other witnesses say, that after the death of Williams they were both at this sulphur spring looking for coal; the former says this was the next fall after Williams' death, "that we aimed to open up the coal for his wife." The latter says: "We went there to look for coal", and "found a little bit." On cross-examination

·the former says, that he had never seen any prospecting done there before that; he had heard that the water came off of coal, but had never heard that there was coal back there. True all this evidence may not be proof positive that Williams had seen this coal at the spring; but his reference in the deed to the existence of coal in that vicinity, and the fact that at least one witness proved that coal was exposed in the opening of that spring, and other witnesses proved prospecting to have been done there, and that Williams was there with one or more of these witnesses prospecting for coal, we think conclusive of the fact that he at least believed coal existed there, and that the subject of the exception in his deed was the vein of coal there, or supposed to be there when he made the deed. Another very strong fact and circumstance proved, supporting our conclusion is, that prior to making the deed the prospective purchasers had made tests of this and adjoining lands for this Warden seam of coal, so called, and that one, if not more, of these bore holes had been put down on the Williams land, the first, already referred to, near the south western boundary line of the Williams tract, and where the Warden or Sewell seam or vein was found at the depth of some thirteen feet below the surface. The proof is that Williams himself was there at that hole, and knew that the purchaser was then making a test of his land for that very Sewell seam. Other seams of commercial value have since been located below the Sewell seam, but these have not been proven by actual test to be present under the Williams tract. These lower veins of coal, the first found some three hundred feet below the Sewell seam, and others at still lower depths, had not then been discovered or worked, and it is quite evident that these lower veins were not the only veins covered by the grant to the grantees in the deed. Before their purchase they tested the land for the Sewell seam. Williams knew this. We must assume also that he had knowledge of the conditions existing about the sulphur spring, and believed that a vein of coal existed there. Coal appeared in the spring. The fact that that vein is of little, if any, commercial value is unimportant. If that was the vein excepted, or intended to be, and we think it undoubtedly was, the exception must be applied to that vein as its subject matter.

But we cannot further detail the evidence. It suffices to say,

that after having carefully read and considered all the evidence, and the many authorities cited and relied upon by counsel, we have concluded that the judgment below was clearly right, and should be affirmed, and it will be so ordered. ·

*Affirmed.*